**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

P.C. Hoag & Co., Inc.

    v.                                    Civil No. 15-cv-498-JL

Man Lift Mfg., Co., et al.

## REPORT AND RECOMMENDATION

Plaintiff P.C. Hoag & Co, Inc., ("P.C. Hoag") brought this action in state court alleging that an aerial lift it purchased from defendants Man Lift Mfg., Co. ("Man Lift"), All Terrain Aerial Lifts ("All Terrain"), and A-1 Expert Tree Services, Inc., ("A-1") was defective.  Man Lift removed the matter here, invoking this court's diversity jurisdiction under 28 U.S.C. § 1332, and the case was assigned to the undersigned magistrate judge.  P.C. Hoag and Man Lift consented to the undersigned's jurisdiction and actively litigated this matter, ultimately reaching a settlement.  A-1 and All Terrain never appeared and, on P.C. Hoag's motion, were defaulted by the Clerk of Court.

P.C. Hoag now moves for an entry of default judgment against A-1 and All Terrain and for an award of damages and costs.  Doc. no. 40.  The court held a damages hearing pursuant to Federal Rule of Civil Procedure 55(b) and granted P.C. Hoag leave to file additional evidence in support of its damages claim.  Subsequently, the court determined that it could not

enter a final disposition in this matter, as the defaulted
parties had not consented to the undersigned's jurisdiction as
required by 28 U.S.C. § 636(c)(1).  See Henry v. Tri-Servs.,
Inc., 33 F.3d 931, 933 (8th Cir. 1994); cf. Roell v. Withrow,
538 U.S. 580, 590 (2003) (noting that consent can be inferred
when "the litigant or counsel was made aware of the need for
consent and the right to refuse it, and still voluntarily
appeared . . . before the Magistrate Judge" (emphasis added));
Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 72-73 (1st
Cir. 2001) (holding that magistrate judge did not have the
authority on referral under a different subsection of § 636 to
make a final determination on damages following an entry of
default).  The case was accordingly reassigned to a district
judge, and P.C. Hoag's motion was referred to the undersigned
for report and recommendation.  See U.S. Fid. & Guar. Co. v.
Guzmán, No. 10-cv-1078-FAB-MEL, 2012 WL 4790314, at *1 n. 1
(D.P.R. Sept. 20, 2012), R&R adopted sub nom. U.S. Fid. & Guar.
Co. v. Cobián-Guzmán, No. 10-cv-1078-FAB, 2012 WL 12996294, at
*1 (D.P.R. Oct. 5, 2012) (issuing a report and recommendation
because the defaulted parties had not consented to
jurisdiction); Brown v. Bussone, No. 12-cv-10338-LTS, 2012 WL
4758033, at *1 (D. Mass. July 30, 2012) (same).

     For the reasons that follow, the court recommends that P.C.
Hoag's motion be granted in part as to liability, that damages

2

be awarded in the amount of $30,214.65, and that P.C. Hoag's request for costs be denied without prejudice.

## I.    STANDARD OF REVIEW

After default is entered and when the amount at issue is not a sum certain, "the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2); see also KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003). Before entering a default judgment, the court "may examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcón v. Autoridad de Energía Electríca, 301 F.3d 1, 2 (1st Cir. 2002) (quoting Quirindongo Pacheco v. Rolon Morales, 953 F.2d 15, 16 (1st Cir. 1992)). The defaulted party is "taken to have conceded the truth of the factual allegations in the complaint . . . ." Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62-63 (1st Cir. 2002) (internal quotation marks omitted) (quoting Franco v. Selective Ins. Co., 184 F.3d 4, 9 n. 3 (1st Cir. 1999)). The defaulted party does not, however, "admit the legal sufficiency of those claims." 10 James Wm. Moore, Moore's Federal Practice § 55.32[1][b] (3d ed. 2013). In other words, before entering default judgment, the court must determine whether the admitted facts state actionable claims. See Hop Hing Produces Inc. v. X & L Supermarket, Inc., No. 12-cv-1401-

3

ARR-MDG, 2013 WL 1232919, at *2 (E.D.N.Y. Mar. 4, 2013); E. Armata, Inc. v. 27 Farmers Market, Inc., No. 08-cv-5212-KSH, 2009 WL 2386074, at *2 (D.N.J. July 31, 2009).

## II.  BACKGROUND

By virtue of having defaulted, A-1 and All Terrain concede the following facts.[1]

P.C. Hoag is a New Hampshire corporation that provides arborist services.  Man Lift is a Wisconsin[2] corporation that designs, manufactures, sells, markets, promotes, services, and repairs certain aerial lifts commonly used by arborists and other professionals working in the tree cutting and tree servicing industry.  A-1 is a California corporation that solicits sales for Man Lift.  All Terrain is a division of A-1.

On or about November 25, 2012, P.C. Hoag entered into a contract to purchase an A70TDI (Track Drive Insulator) with Tree Care Package aerial lift (the "aerial lift"), which was designed

---

[1] This background is based on the factual allegations in the complaint unless those allegations are inconsistent with evidence presented at the damages hearing.  See Amguard Ins. Co. v. Santos Remodeling, Inc., No. 14-cv-14745-FDS, 2016 WL 424961, at *1 n.1 (D. Mass. Feb. 3, 2016) (citing KPS & Assocs., Inc, 318 F.3d at 17–20) ("On a motion for default judgment, a court may . . . consider any affidavits or evidence on the record.").

[2] The complaint asserts that Man Lift is a Nebraska corporation.  At the damages hearing, however, there was evidence presented that Man Lift operates out of Cudahy, Wisconsin.

by Man Lift (the "purchase and sale agreement").  A-1 and All

Terrain negotiated this sale.  Pursuant to the terms of the

purchase and sale agreement, A-1 and All Terrain were required

to provide the aerial lift "in a condition that fully complied

with all applicable specifications for its intended purpose and

[P.C. Hoag's] needs . . . ."  Compl. (doc. no. 1-1) ¶ 6.  The

aerial lift "was to be free from all material defects and in

good working and functioning condition and capable of performing

as represented."  Id.  To this end, A-1 and All Terrain

expressly warranted to P.C. Hoag that the aerial lift "was

designed and manufactured in a reasonable and workmanlike

manner, . . . was fit for its intended use, was fit for its

specific purpose, was free from latent and/or material defects,

and would perform in a safe manner and within [P.C. Hoag's]

expectations . . . ."  Id. ¶ 22.  P.C. Hoag agreed to pay

$189,097.00 to purchase the aerial lift.

    The aerial lift started malfunctioning soon after P.C. Hoag

received it.[3]  Defendants attempted to repair the aerial lift in

---

[3] Per the complaint, the malfunctions included:

> faults in the glow plug coil and starter coil; defects in
> the engine cradle causing it to fail; slippage in the out
> rigors [sic]; poor paint job permitting rust and corrosion
> shortly after delivery; failure of the battery to be fully
> charged or to hold a system charge; failure of the tool
> circuit to work; improper working of the hour meter;
> failure of the auto leveler to work; broken plastic
> electrical wire connections, including for the hydraulics

New Hampshire on multiple occasions, but each time were unable
to successfully remedy the malfunctions.  P.C. Hoag shipped the
aerial lift to defendants for repairs, but this, too, was
unsuccessful.  P.C. Hoag accordingly demanded, on several
occasions, a revocation of acceptance of the aerial lift on the
basis that it was a nonconforming product.  Defendants refused
to honor this request, resulting in P.C. Hoag initiating this
action in state court.  At the time the complaint was filed, the
aerial lift was not operational.[4]

## III. DISCUSSION

### A. Liability

P.C. Hoag's complaint comprises six counts: defective
product (Count I), negligence (Count II), breach of express
warranties (Count III), breach of implied warranties (Count IV),
breach of contract (Count V), and revocation of acceptance

---

to the boom; failure of the upper boom sensor; failure of
the platform and computer; cracked axles on the two
opposite track axles; faulty starter; faulty hydraulic
hoses; and blown fuses.

Doc. no. 1-1 ¶ 7.

[4] The complaint was filed in state court on October 22,
2015.  Doc. no. 1-1 at 2.  Based on the evidence presented at
the damages hearing, discussed in greater detail below, the
aerial lift was not functional as of that date, but was fully
repaired as of March 2016.

6

(Count VI).  As this matter was removed to this court solely on the basis of diversity jurisdiction, see doc. no. 1 at 2, each claim arises under state law.

1.    Defective Product and Negligence (Counts I and II)[5]

The court turns first to Counts I and II.  Both of these counts appear to assert products liability claims, with the former brought under a strict liability theory and the latter alleging negligence.  As to strict liability, "New Hampshire follows the Restatement (Second) of Torts, § 402A . . . ." Bougopoulos v. Altria Grp., Inc., 954 F. Supp. 2d 54, 58 (D.N.H. 2013) (citing Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 824 (2005)).  Under this doctrine, "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer." Id. (quoting Kelleher, 152 N.H. at 824).  In contrast, to prevail on a products liability claim based on negligence, a plaintiff "must demonstrate all that is required to prove [an]

_____

[5] On March 24, 2017, P.C. Hoag filed a motion, assented to by Man Lift, seeking the dismissal of Counts I and II without prejudice.  Doc. no. 32.  The undersigned granted that motion three days later.  See Mar. 27, 2017 Endorsed Order.  As discussed above, however, the undersigned cannot issue a dispositive order with respect to A-1 or All Terrain, as those defendants have not consented to jurisdiction under 28 U.S.C. § 636(c)(1).  The March 27 Order therefore did not extend to A-1 or All Terrain, and the court must address Counts I and II in this Report and Recommendation.

underlying negligence action." Palmer v. Nan King Rest., Inc.,
147 N.H. 681, 684-85 (2002) (citing 63 Am. Jur. 2d Products
Liability § 206 (1996)).

P.C. Hoag is not entitled to an entry of default judgment
against All Terrain or A-1 under either products liability
theory.  Assuming without finding that P.C. Hoag has otherwise
stated such claims, both are nonetheless barred by the economic
loss doctrine.  It is well established under New Hampshire law
"that a plaintiff may not ordinarily recover damages for purely
economic loss in tort or products liability claims." Kelleher,
152 N.H. at 835 (citation omitted).  "In the products liability
context, economic loss is characterized as damage that occurs to
the inferior product itself, through deterioration or non-
accidental causes." Id. (citation omitted).  When the physical
harm is so limited, a plaintiff is barred from recovering "the
resulting loss due to repair costs, decreased value, and lost
profits . . . ." Lockheed Martin Corp. v. RFI Supply, Inc., 440
F.3d 549, 554 (1st Cir. 2006) (quoting East Rover S.S. Corp. v.
Transamerica Delaval, Inc., 476 U.S. 858, 870 (1986)).

P.C. Hoag has failed to allege in its complaint that the
defects in the aerial lift caused physical harm to any person or
property other than the aerial lift itself.  Though the
complaint does allege that the aerial lift's defects caused
"damages to other property," see doc. no. 1-1 ¶¶ 14, 20, nowhere

8

does P.C. Hoag indicate what specifically those damages were, rendering those assertions the sort of conclusory statements that the court need not assume true for the purposes of its analysis, see 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2688.1 (4th ed.) (noting that a "a party in default does not admit conclusions of law"); see also DIRECTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir. 2007); Black v. Lane, 22 F.3d 1395, 1407 (7th Cir. 1994).  And even if the complaint did allege noneconomic harm recoverable under a products liability theory, P.C. Hoag has plainly abandoned that request, as its motion for default judgment solely seeks economic damages caused by harm to the aerial lift itself.  See doc. no. 40-1 ¶ 2.  Counts I and II are therefore barred by the economic loss doctrine.

Accordingly, the court recommends that the district judge deny P.C. Hoag's motion to the extent it seeks an entry of default judgment against A-1 and All Terrain on Counts I and II.

## 2.    Breach of Express and Implied Warranties (Counts III and IV)

In Counts III and IV, P.C. Hoag alleges that All Terrain and A-1 breached express and implied warranties with respect to the aerial lift.  As this case involves the sale of a good, the Uniform Commercial Code ("UCC") governs.  See N.H. Rev. Stat. Ann. ("RSA") § 382-A:2-102; see also RSA 382-A:2-105(1)

("'Goods' means all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale . . . ."). Under the UCC, "express warranties can be created by promises or affirmations of fact which relate to the goods and become part of the contractual bargain." Fassi v. Auto Wholesalers of Hooksett, 145 N.H. 404, 406 (2000) (citations omitted); see also RSA 382-A:2-313(1). The UCC contains two provisions related to implied warranties: RSA 382-A:2-314, which "generally provides that a seller impliedly warrants his goods are merchantable or generally fit for the 'ordinary purposes' for which the goods are used," Xerox Corp. v. Hawkes, 124 N.H. 610, 616 (1984), and RSA 382-A:2-315, which provides for an implied warranty of fitness for a particular purpose "when the seller knows that the buyer is relying upon the seller's expertise in selecting goods to fulfill the buyer's particular requirements," id. Unless disclaimed or limited, "a breach of any of these warranties may give rise to a cause of action for incidental or consequential damages." Id. (citation omitted); see also RSA 382-A:2-714; RSA 382-A:2-715.

Here, P.C. Hoag has adequately alleged breach of express warranties on the part of A-1 and All Terrain. The complaint alleges that A-1 and All Terrain made several express warranties to P.C. Hoag regarding the quality and workmanship of the aerial lift, including that it would be free from material defects and

10

fit for its intended use and specific purposes.  There is no
indication the record that A-1 or All Terrain ever disclaimed or
limited these warranties.[6]  And the complaint alleges that the
aerial lift started to malfunction soon after P.C. Hoag received
it and continued to malfunction despite defendants' attempts to
repair it.  When taken as true, these allegations are sufficient
to sustain P.C. Hoag's claims under an express warranty theory.

P.C. Hoag is also entitled to an entry of default judgment
on its implied warranties claim.  Under RSA 382-A:2-314(1), "a
warranty that the goods shall be merchantable is implied in a
contract for their sale if the seller is a merchant with respect
to goods of that kind."[7]  For goods to be merchantable, they
must, among other things, "pass without objection in the trade
under the contract description" and be "fit for the ordinary

---

[6] There is a warranty, attached to a motion to dismiss filed
by Man Lift, which does purport to disclaim all other express
and implied warranties and limit liability for defects in the
material and workmanship of the aerial lift.  <u>See</u> doc. no. 7-4.
But this warranty, which appears to have been part of an
operations manual supplied by Man Lift, makes no mention of A-1
or All Terrain, while at the same time explicitly referencing
Man Lift at least twenty times.  <u>See</u> <u>id.</u>  There is accordingly
no cause to believe that this warranty, to the extent it is
enforceable, extended to any express or implied warranties other
than those made by Man Lift.

[7] "'Merchant' means a person who deals in goods of the kind
or otherwise by his occupation holds himself out as having
knowledge or skill peculiar to the practices or goods involved
in the transaction or to whom such knowledge or skill may be
attributed . . . ." RSA 382-A:2-104(1).

purposes for which such goods are used." RSA 382-A:2-

314(2)(a),(c). Similarly, under RSA 382-A:2-315,

> [w]here the seller at the time of contracting has reason to
> know any particular purpose for which the goods are
> required and that the buyer is relying on the seller's
> skill or judgment to select or furnish suitable goods,
> there is . . . an implied warranty that the goods shall be
> fit for such purpose.

Absent any indication of a waiver or limitation, the allegations

in the complaint, when assumed true, support a claim that A-1

and All Terrain breached the plain terms of both implied

warranty provisions.

The court accordingly recommends that the district judge

grant P.C. Hoag's motion to the extent it seeks an entry of

default judgment against A-1 and All Terrain on Counts III and

IV.

3.   Breach of Contract (Count V)

The court next considers P.C. Hoag's claim for breach of

contract. Under New Hampshire law, "a breach of contract occurs

when there is a failure without legal excuse to perform any

promise which forms the whole or part of a contract." BAE Sys.

Info. & Elecs. Sys. Integration, Inc. v. SpaceKey Components,

Inc., 941 F. Supp. 2d 197, 213 (D.N.H. 2013), aff'd, 752 F.3d 72

(1st Cir. 2014) (brackets and internal quotation marks omitted)

(quoting Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 668

(2013)). A buyer who accepts a good, but then discovers a

12

breach of the sale agreement, must notify the seller of the breach within a reasonable time of the discovery thereof. RSA 382-A:2-607(3)(a). A buyer that does so "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." RSA 382-A:2-714(1). These damages may include incidental and consequential damages under RSA 382-A:2-715. Id. 2-714(3).

Here, P.C. Hoag alleges that A-1 and All Terrain were required, pursuant to the terms of the purchase and sale agreement, to provide the aerial lift "in a condition that fully complied with all applicable specifications for its intended purposes and [P.C. Hoag's] needs . . . ." Doc. no. 1-1 ¶ 6. P.C. Hoag further alleges that the contract required the aerial lift to be "free from all material defects and in good working and functioning condition and capable of performing as represented." Id. But, according to P.C. Hoag, the aerial lift started malfunctioning soon after it was received. P.C. Hoag alleges that it informed defendants of these defects, and that defendants attempted to repair the aerial lift, but that the repairs were unsuccessful and the aerial lift continued to malfunction. Assuming the truth of these allegations, P.C. Hoag has adequately alleged that A-1 and All Terrain breached the purchase and sale agreement.

13

P.C. Hoag's motion for default judgment should accordingly be granted as to Count V, the breach of contract claim.

### 4.    Revocation of Acceptance (Count VI)

Lastly, the court considers Count VI.  In this count, P.C. Hoag contends that it is "entitled to revocation of acceptance and rescission of the purchase and sale agreement, and to all of its general, special, and consequential damages in an amount to be proven at time of trial . . . ."  Doc. no. 1-1 ¶ 39. Revocation of the acceptance of a good, formally known as rescission, is governed by RSA 382-A:2-608.  Generally speaking, "[r]escission is an equitable remedy" under New Hampshire law. Cf. Faiella v. Green Tree Servicing LLC, No. 16-cv-088-JD, 2016 WL 4530452, at *1 (D.N.H. Aug. 29, 2016) (quoting Ellis v. Candia Trailers & Snow Equip., Inc., 164 N.H. 457, 462 (2012)). But under the UCC, a buyer need not choose between revocation of acceptance and the recovery of damages.  See RSA 382-A:2-608 cmt. 1.  Indeed, monetary damages are available under RSA 382-A:2-608 as allowed by RSA 382-A:2-711.  See Beer v. Bennett, 160 N.H. 166, 174 (2010).

The court declines to recommend that P.C. Hoag receive equitable relief under Count VI.  Though requested in the complaint, P.C. Hoag has not sought such relief anywhere in its motion for default judgment or the affidavit attached thereto. Rather, the sole request in either document is for monetary

14

damages related to economic harms allegedly caused by the defects in the aerial lift.  The discussion at the damages hearing was similarly focused.  The court accordingly concludes that P.C. Hoag has abandoned any claim for equitable relief as part of this action.

P.C. Hoag may nevertheless recover damages if it has stated a viable claim under RSA 382-A:2-608.  "Once a valid revocation of acceptance has been made, the proper measure of damages is found in RSA 382-A:2-711."  Beer, 160 N.H. at 174 (citation omitted).  That statute allows for the recovery of damages under RSA 382-A:2-713, regardless of whether the buyer has successfully cancelled the sale.  See RSA 382-A:2-711(1), (1)(b).  For its part, RSA 382-A:2-713 allows a buyer to recover, among other things, any incidental and consequential damages available under RSA 382-A:2-715.  RSA 382-A:2-713(1).  Thus, to the extent P.C. Hoag has alleged a claim under RSA 382-A:2-608, it may recover incidental and consequential damages regardless of whether it actually seeks equitable relief under that provision.

Turning to the complaint, the court has little trouble concluding that P.C. Hoag has stated a claim under RSA 382-A:2-608.  To prevail under that statute, the buyer of a good must prove: (1) that there was a nonconformity that substantially impaired the value of the good; (2) that the buyer accepted the

good without having discovered the nonconformity; (3) that
acceptance was reasonably induced either by the difficulty in
discovering the nonconformity before acceptance or by the
seller's assurances; (4) that revocation of acceptance occurred
within a reasonable time after the buyer discovered or should
have discovered the nonconformity; (5) that revocation occurred
before any substantial change in the condition of the good not
caused by its own defects; and (6) that the buyer provided due
notice of revocation to the seller.  RSA 382-A:2-608(1), (1)(b),
(2); see also St-Laurent v. Fiermonti Oldsmobile, Inc., 136 N.H.
70, 73-74 (1992); Werner v. Montana, 117 N.H. 721, 730 (1977).
When taken as true, the factual allegations in the complaint,
discussed in greater detail above, satisfy each of these
elements.  P.C. Hoag is accordingly entitled to an entry of
default judgment against A-1 and All Terrain on its revocation
of acceptance claim.

In sum, the court recommends that the district judge enter
default judgment against A-1 and All Terrain on Count VI to the
extent it seeks incidental and consequential damages, as defined
by RSA 382-A:2-715.

**B.    Damages**

While an entry of default judgment constitutes an admission
of liability, a plaintiff must still prove damages against the
defendant unless the amount is "for a sum certain or a sum that

16

can be made certain by computation . . . ." Fed. R. Civ. P.
55(b)(1); see also Torres-Rivera v. O'Neill-Cancel, 524 F.3d
331, 339 n. 3 (1st Cir. 2008); KPS & Assocs., Inc., 318 F.3d at
19. "In the Rule 55 context, a claim is not a sum certain
unless there is no doubt as to the amount to which a plaintiff
is entitled as a result of the defendant's default." KPS &
Assocs., Inc., 318 F.3d at 19 (citations omitted).

P.C. Hoag seeks three categories of damages: lost profits,
debt service, and costs to repair the aerial lift's defects.
None of these categories are sums certain, as they are not
ascertainable from the pleadings and depend on the actual
losses/costs incurred by P.C. Hoag due to the defects in the
aerial lift.  The court therefore conducted a damages hearing
pursuant to Rule 55(b)(2).  See Fed. R. Civ. P. 55(b)(2)(B)
("The court may conduct hearings . . . when, to enter or
effectuate judgment, it needs to . . . determine the amount of
damages . . . ."); see also KPS & Assocs., Inc., 318 F.3d at 21
(noting that when the amount of damages is not a sum certain, a
court may only dispense with a Rule 55(b)(2) hearing "[i]n
limited circumstances").  At the hearing, P.C. Hoag presented
the testimony of its president, Peter Hoag, and submitted
several documents into evidence.  With the court's permission,
P.C. Hoag supplemented those submissions following the hearing.
See doc. no. 42.

1.  <u>Scope of Analysis</u>

Before turning to the damages themselves, the court will briefly address the scope of its damages analysis and the governing law.  At the outset, the court concludes that it need only conduct a single damages analysis per category of damages sought.  As discussed below, each category of damages falls within the UCC's definition of either incidental or consequential damages.  And, as previously mentioned, incidental and consequential damages are available under all of the claims on which the court recommends an entry of default judgment.

Incidental damages include "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."  RSA 382-A:2-715(1).  Among other things, incidental damages are "intended to provide reimbursement for the buyer who incurs reasonable expenses in connection with the handling of rightfully rejected goods or goods whose acceptance may be justifiably revoked . . . ."  <u>Id.</u> cmt. 1.

Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contract has reason to know and which could not reasonably be prevented by cover or otherwise . . . ."  RSA 382-

18

A:2-715(2)(a).  Under New Hampshire law, three requirements must be met in order for consequential damages to be recoverable: (1) they must be reasonably foreseeable; (2) they must be ascertainable; and (3) they must be unavoidable.  <u>Hydraform Prod. Corp. v. Am. Steel & Aluminum Corp.</u>, 127 N.H. 187, 198 (1985).

As to the first requirement — foreseeability — consequential damages are limited "to those reasonably foreseeable at the time of the contract."  <u>Id.</u> at 197 (citation omitted).  To satisfy this requirement, "the injury for which the damages are sought must follow the breach in the natural course of events, or the evidence must specifically show that the breaching party had reason to foresee the injury."  <u>Id.</u> (citation and internal quotation marks omitted).

The second requirement limits consequential damages "to recompense for the reasonably ascertainable consequences of the breach."  <u>Id.</u> (citation omitted).  "While proof of damages to the degree of mathematical certainty is not necessary," a claim for consequential damages "must rest on evidence demonstrating that the [damages] claimed were 'reasonably certain' in the absence of the breach."  <u>Id.</u> (citations omitted).  "Speculative losses are not recoverable."  <u>Id.</u>

Finally, a party may only recover consequential damages "if the loss could not reasonably be prevented by cover or

otherwise." Id. at 197-98 (internal quotations and citations
omitted).  Under the UCC, "cover" means "making in good faith
and without unreasonable delay any reasonable purchase of or
contract to purchase goods in substitution for those due from
the seller."  RSA 382-A:2-712(1).

    2.   Lost Profits

    The court turns first to P.C. Hoag's request for lost
profits.  Under New Hampshire law, lost profits are a form of
consequential damages.  See Hydraform, 127 N.H. at 197-98; see
also Mahoney v. Town of Canterbury, 150 N.H. 148, 154 (2003);
Drop Anchor Realty Tr. v. Hartford Fire Ins. Co., 126 N.H. 674,
678 (1985).  Accordingly, in order to recover lost profits, P.C.
Hoag must demonstrate that they are reasonably foreseeable,
ascertainable, and unavoidable.

    As an initial matter, the court concludes that P.C. Hoag
has met the first and third of these requirements here.  Based
on the allegations in the complaint and the evidence presented
at the damages hearing, A-1 and All Terrain reasonably should
have foreseen at the time of the sale that if the aerial lift
malfunctioned, P.C. Hoag would suffer lost profits.  And while
there is no evidence that P.C. Hoag actually replaced the aerial
lift until spring or summer of 2016, the court cannot conclude,
based on the record before it, that this delay was unreasonable.
Mr. Hoag testified that the aerial lift was custom built for

P.C. Hoag and that it took four months to manufacture.  This testimony supports a reasonable inference that the aerial lift was not an easy item to substitute or replace.  Additionally, there is evidence in the record that P.C. Hoag actively sought repairs of the aerial lift until March 2016, when, according to Mr. Hoag, the aerial lift was finally fixed.  Thus, there is no indication that P.C. Hoag was dilatory in seeking to remedy the aerial lift's defects.  In light of these facts, P.C. Hoag has established that lost profits were reasonably foreseeable and unavoidable up until that date.

Whether P.C. Hoag has established the second requirement for consequential damages — that the damages be ascertainable — is a more difficult question.  P.C. Hoag seeks lost profits in the amount of $215,369.18.[8]  To arrive at this number, P.C. Hoag: first subtracted the total number of hours it contends it used the aerial lift during the relevant period (870) from the total

---

[8] In its motion for default judgment, P.C. Hoag requested lost profits totaling $260,750.00.  Doc. no. 40-1 ¶ 2.A.  At the hearing, however, P.C. Hoag noted that an error had been made in that calculation, as it had not discounted some 870 hours P.C. Hoag conceded it was able to use the aerial lift during the relevant period.  Peter Hoag therefore performed a new lost profit calculation while on the stand, arriving at a total of $220,583.92.  In reaching this number, Peter Hoag appears to have mistakenly deducted a value of 770 hours instead of 870 hours.  As this was seemingly nothing more than a computational error, the court uses the correct value for the purposes of its analysis.

hours it contends it would have been able to bill had the lift
functioned properly (5,000); then multiplied that difference by
the hourly rate it charged for use of the lift ($75); and
finally multiplied that product by the profit margin it contends
it was able to earn using the lift (69.53%).[9]  Embedded in this
calculation are four primary assumptions: (1) that P.C. Hoag
would have been able to bill 5,000 hours during the operative
period if the aerial lift had functioned properly, (2) that P.C.
Hoag was only able to use the aerial lift for 870 hours during
that period, (3) that P.C. Hoag would have been able to bill $75
per hour for use of the lift, and (4) that the profit margin
attributable to the lift was 69.53%.  In order to be awarded
lost profits in the amount it requests, P.C. Hoag must prove
each of these assumptions.

    At the outset, the court concludes that P.C. Hoag has
sufficiently established the $75 per hour rate.  At the hearing,
Mr. Hoag testified that P.C. Hoag charged $75 per hour when the
lift was in use.  There being no contrary evidence in the
record, this testimony sufficiently establishes $75 per hour as
the operative hourly rate.

    Although more speculative, there is also sufficient
evidence in the record to support a 69.63% profit margin.  Mr.

---

[9] This calculation can be written as the following equation:
(5,000−870) x 75 x 0.6953 = 215,369.175.

Hoag testified that he arrived at this number by considering the costs associated with using the aerial lift (such as insurance, maintenance, upkeep, and operation costs), the fact that the lift is a "self-contained system," and his familiarity with the profit margins P.C. Hoag historically earned for charges related to machines.  While Mr. Hoag certainly could have provided more detail as to the specifics of this calculation, the court is cognizant that consequential damages need not be proved "to the degree of mathematical certainty . . . ."  Hydraform, 127 N.H. at 197.  Thus, when considering Mr. Hoag's testimony in light of his experience in the industry and knowledge of P.C. Hoag's finances, the court concludes that P.C. Hoag has sufficiently established a profit margin of 69.53%.  Cf. Petrie-Clemons v. Butterfield, 122 N.H. 120, 126 (1982) (holding that a factfinder had the discretion "to accept the testimony that the plaintiffs' profit margin was between 43 percent and 50 percent"); Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 75 (1st Cir. 2008) (holding that a jury could calculate a profit margin using a company's revenues and operating expenses).

P.C. Hoag's assumption that it would have been able to bill 5,000 hours during the operative period had the aerial lift functioned properly is more problematic.  This number is itself based on two separate contentions: (1) that P.C. Hoag would have been able to utilize the aerial lift for approximately 1,000

billable hours per year, and (2) that defects in the aerial lift
caused P.C. Hoag to lose profits over a five-year period.   The
court will consider each of these contentions in turn.

     P.C. Hoag bases its estimate that it would have been able
to bill 1,000 hours per year on several factors.   First, Mr.
Hoag testified at the hearing that P.C. Hoag was able to bill
approximately 590 hours per year with its previous bucket
truck,[10] a number he believed P.C. Hoag would have been able to
double with the aerial lift because the lift could access areas
that the bucket truck could not.   Next, Mr. Hoag pointed to the
fact that P.C. Hoag was able to bill 90 hours with the aerial
lift in December 2012 and 89.5 hours with a rental aerial lift
provided by Man Lift when the aerial lift was being repaired
between January 2 and August 6, 2014.   Mr. Hoag noted that when
extrapolated across an entire year, those values worked out to
more than 1,000 hours billed.   Similarly, Mr. Hoag testified
that P.C. Hoag was able to bill 524 hours in six months with a
replacement aerial lift purchased in 2016, which, when doubled,
also equated to an annual rate of more than 1,000 hours.   On
these bases, P.C. Hoag estimated that it would have been able to

---

[10] P.C. Hoag submitted a summation of the hours per year
billed with the previous bucket truck from 2005 until 2016.   See
Pl.'s Ex. 4.   Based on these values, P.C. Hoag billed an average
of 589.375 hours per year during that period.

bill 1,000 hours per year with the aerial lift had it functioned properly.

This estimate leaves several things to be desired. For one, P.C. Hoag presented no evidence that there was a demand for 1,000 hours per year of aerial lift services, regardless of whether P.C. Hoag had the capacity to use the aerial lift for that amount of time. Similarly, none of P.C. Hoag's extrapolations take into consideration seasonal ebbs and flows in the use of the aerial lift. Yet at the same time, there was little direct evidence presented that use of the lift would have remained constant on a month-by-month basis. Further, only one of the months cited actually involved the use of the aerial lift, and there was no direct evidence as to how the rental aerial lift provided by Man Lift and the replacement aerial lift purchased by P.C. Hoag compared functionally to the subject lift. Evidence addressing one or more of these areas would have left the court less reticent to accept P.C. Hoag's 1,000-hour-per-year estimate at face value.

Still, when balancing these shortcomings against the evidence in the record, the court concludes that P.C. Hoag has just barely pushed its 1,000-hour-per-year estimate beyond the realm of mere speculation. Indeed, when taking the evidence presented in its totality, and considering it in light of the New Hampshire Supreme Court's instruction that consequential

25

damages need not be proved with mathematical certainty, the
court concludes that it is more likely than not that P.C. Hoag
would have been able to bill somewhere in the realm of 1,000
hours per year with the aerial lift had it functioned properly.
The court will accordingly use this value, which equates to
83.33[11] hours billed per month, when calculating P.C. Hoag's lost
profit damages.

The court turns, then, to P.C. Hoag's contention that the
defects in the aerial lift caused P.C. Hoag to lose profits over
a five-year period.  This contention is not supported in the
record.  P.C. Hoag specifically seeks lost profits for 2012,
2013, 2014, 2015, and 2016.  See Pl.'s Ex. 4.  At the hearing,
however, Mr. Hoag testified that the aerial lift was not
delivered until late November 2012 and that P.C. Hoag was able
to use the lift for 90 hours during December of that year.
There is therefore no evidence that P.C. Hoag lost any profits
related to the aerial lift during 2012.  Likewise, Mr. Hoag
testified that the aerial lift was fully repaired as of March
2016, but that P.C. Hoag elected to attempt to sell the lift
rather than continue to use it.  In light of this testimony,
there is no basis to conclude that P.C. Hoag lost any profits
attributable to defects in the aerial lift after that date.

---

[11] The court rounds the decimal to the nearest hundredth.

Thus, the maximum total timeframe in which P.C. Hoag could have lost profits related to the aerial lift was from January 2013 through March 2016.  This period, totaling 39 months (or three years and three months), is substantially shorter than the five-year period relied upon by P.C. Hoag in its lost profits calculation.

This brings the court to the last assumption embedded in P.C. Hoag's lost profits calculation: that during the operative period, the aerial lift was inoperable except for the 870 hours that P.C. Hoag concedes the lift was in use.  Upon generous review of the record, the court concludes that there is no evidence to support this contention.

P.C. Hoag could conceivably have proved the time the aerial lift was inoperable in a couple of ways.  For instance, P.C. Hoag could have presented evidence affirmatively demonstrating that it only used the aerial lift for 870 hours during the relevant period.  Such evidence, depending on how it was presented, could plausibly support an inference that the lift was inoperable for all but that period of time.  Beyond a single reference by Mr. Hoag that he conducted a "calculation," however, P.C. Hoag has provided no guidance as to how the 870-hour number was reached.  Thus, the evidence in the record does not support an inference that the aerial lift was only in use for 870 hours during the period in question.

27

Alternatively, P.C. Hoag could present evidence proving the total time in which it could not use the aerial lift due to the lift's defects.  P.C. Hoag presented some evidence to this effect at the damages hearing.  But even construed liberally, this evidence does not establish that the aerial lift was out of commission for nearly as long as P.C. Hoag contends.  Indeed, the court can only identify four periods, totaling thirteen-and-one-half months, for which there is evidence that the aerial lift was not functional due to its defects.

The first period in which there is evidence that the aerial lift was inoperable is August 2013.[12]  Mr. Hoag testified that P.C. Hoag was unable to use the aerial lift for a month during that time, as certain computers needed to be sent away for repairs.  He testified that the aerial lift was back in use for September 2013.

The aerial lift was next out of commission between October 2013 and January 13, 2014.  Mr. Hoag testified that for a month of that time the machine in Wisconsin undergoing repairs to cracking on the framework of its tracks.  He testified that the

---

[12] Mr. Hoag testified that the aerial lift suffered malfunctions "immediately" after it was delivered, including faults in the electrical system, outriggers drifting overnight, a bad paint system, and malfunctioning sensors.  There is no suggestion, though, that these malfunctions impacted P.C. Hoag's profits prior to August 2013.

aerial lift was returned in early November 2013, but that P.C.
Hoag was unable to use it for the rest of 2013 and into 2014,
seemingly due to electrical issues.  According to an invoice
from Valladares Transportation & Repair, Inc., ("Valladares"),
the machine was functioning again as of January 13, 2014.  See
doc. no. 42-1 at 24.  There is no evidence of other malfunctions
attributable to defects during the remainder of January 2014.[13]

The next period in which there is evidence that the aerial
lift was unavailable is a three-day period in February 2014.
This is demonstrated by a February 7, 2014 invoice from
Valladares, indicating that the aerial lift would not start as
of Monday, February 3, 2014, due to a faulty starter, but that
Valladares would replace the starter on Wednesday.  See id. at
28.  There is no indication in the record that this repair was
not made or that the aerial lift continued to malfunction after
that date.

The evidence in the record demonstrates that the aerial
lift was next inoperable between July 2 and August 6, 2014.  See
Pl.'s Ex. 4.  P.C. Hoag may not recover lost profits for that

---

[13] There is a January 28, 2014 invoice from Valladares
indicating that the aerial lift suffered engine issues on
January 27, 2014.  See doc. no. 42-1 at 23.  P.C. Hoag may not
recover for those issues, however, as it appears they were
caused by P.C. Hoag itself. See id. (attributing the engine
issues to the fact the "customer had disconnected the wrong wire
at the fuse block by accident").

period, however, as Mr. Hoag testified that Man Lift supplied
P.C. Hoag with a rental lift.  This testimony is consistent with
a document submitted into evidence during the damages hearing,
which indicates that Man Lift supplied P.C. Hoag with a "Red
Lift" rental for July 2 to August 6, 2014.  See id. ("RED LIFT –
RENTAL SUPPLIED BY MAN LIFT.").[14]  The court accordingly does not
count this period in its lost profits calculation.

The last period in which there is evidence that the aerial
lift was not functioning is from July 2015 until March 2016.
P.C. Hoag has submitted an invoice and a bill of lading that,
when taken together, suggest that the aerial lift was at the
premises of All Access Equipment ("All Access") in Wilmington,
Massachusetts, from July of 2015 until August 19, 2015.  See
doc. no. 42-1 at 9, 10.[15]  The lift was then shipped to Bailey
Specialty Cranes, in Muskego, Wisconsin, for further repairs.

_____

[14] The fact that the "Red Lift" was referred to as a
"rental," which could be construed to suggest that P.C. Hoag
paid for its use, does not alter the court's analysis.  Even
assuming rental fees are otherwise recoverable as incidental or
consequential damages, they do constitute lost profits.  Indeed,
Mr. Hoag testified that P.C. Hoag was able to bill 89.5 hours
for the use of the rental aerial lift.  See also Pl.'s Ex. 4.

[15] The invoice is dated July 13, 2015, but indicates that
All Access performed 45 hours of work on the aerial lift prior
to that date.  See doc. no. 42-1 at 10.  This fact, coupled with
the clear indication that the aerial lift was shipped to All
Access's premises, see id. at 9, supports an inference that P.C.
Hoag was unable to use the aerial lift at all during the month
of July.

<u>Id.</u> at 9.[16]  Based on Mr. Hoag's testimony, the aerial lift
remained in Wisconsin from that date until it was repaired in
March 2016.[17]

Other the above periods, P.C. Hoag has submitted no
evidence of lost profits.[18]  Thus, the evidence in the record
demonstrates that P.C. Hoag suffered lost profits due to the
aerial lift's unavailability for approximately four months in
2013 (August, plus October through December), for approximately
a half of a month in 2014 (January 1 through 13 and February 3
through 5), for approximately six months in 2015 (July through
December), and for approximately three months in 2016 (January
through March).  Totaled together, this equals thirteen-and-one-
half months of lost profits due to the aerial lift's
unavailability.

---

[16] Mr. Hoag testified that Bailey Specialty Cranes was owned
and operated by Jeff Bailey, who had previously owned Man Lift
and was the original engineer of the aerial lift.

[17] Mr. Hoag testified that the aerial lift remained in
Wisconsin as of the date of the damages hearing.  But as already
discussed, there is no evidence that P.C. Hoag lost profits
related to the lift after that date.

[18] At the hearing, Mr. Hoag took pains to describe the
difficulties presented by the defects in the aerial lift.  The
court does not question the veracity of this testimony.
Nevertheless, there is simply no cognizable evidence that these
difficulties impacted P.C. Hoag's profits other than during the
months discussed above.  P.C. Hoag's has therefore failed to
demonstrate that it lost profits related to the lift other than
during those months.

Using this number, the court can calculate the total lost profits that P.C. Hoag has demonstrated it sustained due to the aerial lift's defects. To do so, the court: first multiplies the total number of months in which profits were lost (13.5) by the average number of hours per month that P.C. Hoag would have been able to bill for the aerial lift (83.33); then multiplies that product by the hourly rate P.C. Hoag charged for use of the aerial lift ($75); and finally multiplies that product by P.C. Hoag's profit margin when using the aerial lift (69.53%). Based on this calculation, the court concludes that P.C. Hoag has proved that it lost $58,663.59 in profits due to defects in the aerial lift.[19]

3.  <u>Debt Service</u>

P.C. Hoag next seeks to recover debt service payments made pursuant to the financing agreement for the aerial lift during the period the aerial lift was unusable. Though there does not appear to be any controlling authority or case law from this district on point, other courts have indicated that debt service payments can be recovered as incidental damages under the UCC. See <u>Cole Energy Dev. Co. v. Ingersoll-Rand Co.</u>, 913 F.2d 1194, 1202 (7th Cir. 1990). The measure of such damages is the

---

[19] In equation form, this calculation can be written as follows: 13.5 x 83.33 x 75 x 0.6953 = 58,663.59.

"portion of [the debt service] [the plaintiff] would not have spent had it known that the equipment would not produce at full capacity . . . ." <u>Id.</u>  This reading is consistent with the definition of incidental damages under New Hampshire's version of the UCC.  <u>See</u> RSA 382-A:2-715(1) cmt. 1.

P.C. Hoag seeks approximately $90,000.00 in debt service damages.[20]  At the hearing, Mr. Hoag testified that he reached this number by applying monthly payments of $1,912.33 over a four-year period.[21]  But this calculation suffers from the same infirmity as P.C. Hoag's lost profits calculation: in short, there is insufficient evidence in the record to support a finding that the aerial lift was unusable for anywhere near four years.

In the court's view, any recovery for debt service must be limited to the period in which P.C. Hoag has proved that the aerial lift was inoperable.  This is consistent with the underlying premise of P.C. Hoag's request, <u>see</u> doc. no. 40-1 ¶ 2.B. (seeking to recover payments made "during times when the

---

[20] P.C. Hoag requested $90,000.00 in the affidavit attached to the motion for default judgment.  <u>See</u> doc. no. 40-1 ¶ 2.B. At the hearing, Mr. Hoag calculated $87,802.33 in debt service damages.

[21] P.C. Hoag appears to have arrived at four years by crediting a year for the 870 hours it concedes it was able to use the aerial lift against the five-year period it contends the aerial lift was inoperable.

machine was unusable") and, accordingly, can fairly be said to
be the portion of the debt service P.C. Hoag would not have
spent had it known the aerial lift would malfunction.  Thus, the
same thirteen-and-one-half month period applicable to the lost
profits calculation can also be applied to the debt service
calculation, as this is the total amount of time for which there
is evidence that the aerial lift was sidelined due to its
defects.  Multiplying this value by the $1,912.33 per moth P.C.
was paying under its financing agreement results in debt service
damages totaling $25,816.45.

    4.   Repair Costs

    Finally, the court turns to P.C. Hoag's request to recover
the costs it incurred repairing the defects in the aerial lift.
This request falls under the umbrella of incidental damages, as
defined by the UCC.  See RSA 382-A:2-715 cmt. 1 (noting that
incidental damages are "intended to provide reimbursement for
the buyer who incurs reasonable expenses in connection with the
handling of [the good]").

    P.C. Hoag specifically seeks repair costs totaling
approximately $36,000.00.  In support of this request, P.C. Hoag
submitted into evidence a chart summarizing the expenses it
alleges it incurred related to the aerial lift.  See Pl.'s Ex.
2.  The chart consists of 36 individual line items of expenses,
totaling $36,134.01.  See id.  At the hearing, Mr. Hoag

testified that the chart was prepared by P.C. Hoag's bookkeeper.

P.C. Hoag also submitted into evidence certain invoices that it alleges support the entries in the chart.  <u>See</u> Pl.'s Ex. 3.  The court granted P.C. Hoag leave to supplement this submission with additional invoices retained by P.C. Hoag but not submitted at the hearing.  P.C. Hoag timely filed its supplement.  <u>See</u> doc. no. 42.

As an initial matter, the court declines to accept the chart as substantive evidence of the repair costs incurred by P.C. Hoag.  To the extent the Federal Rules of Evidence apply in the context of a damages hearing,[22] P.C. Hoag has not laid the proper foundation to establish that the chart is admissible either as a record of regularly conducted activity under Rule 803(6) or as a summary to prove content under Rule 1006.  And even if it were admissible under one of those rules (or the

---

[22] There is little authority addressing whether the Rules of Evidence apply in the context of Rule 55(b) hearings.  The court can identify only one federal appellate opinion touching on this issue, an unpublished opinion in which the First Circuit assumed in dictum that the Rules of Evidence applied.  <u>See</u> <u>Fox v. Se.</u> <u>Transp. Inc.</u>, 25 F.3d 1037 (1st Cir. 1994) (table).  And the only district court opinion the court has identified that is on point is 2016 decision out of the District of Colorado in which the court stated that evidentiary objections are not waived in the Rule 55(b) context simply because the default party did not appear, as this would "effectively throw out the Federal Rules of Evidence in Rule 55 hearings . . . ."  <u>Shell v. Swallow</u>, No. 09-cv-00309-MSK-KMT, 2016 WL 183631, at *9 (D. Colo. Jan. 15, 2016), <u>aff'd</u>, 671 F. App'x 1028 (10th Cir. 2016).

Rules of Evidence did not apply), the chart does not contain sufficient detail for the court to conclude that each of the listed expenses more likely than not resulted from a defect in the aerial lift. Thus, as implied at the damages hearing, the court will only recommend damages be awarded for repair costs to the extent the line items in the chart are supported by underlying documentation substantiating repairs due to defects in the aerial lift.

Cross referencing the chart with the invoices submitted into evidence, the court concludes that P.C. Hoag has not provided documentation for several of the line item entries. These are the entries dated February 6, 2013, March 11, 2013, July 28, 2013, January 25, 2014, August 26, 2014, and December 31, 2014. P.C. Hoag accordingly should not recover damages related to those entries.

P.C. Hoag similarly should not recover for the entry dated November 22, 2016. The sole documentation for this entry is a credit card statement identifying an $800.00 payment to CCG LLC Appraisal in Summerfield, Florida. Doc. no. 42-1 at 13. This document does not provide the court with sufficient detail to conclude that this expense was incurred to repair some defect in the aerial lift. Accordingly, P.C. Hoag has not demonstrated that the November 22, 2016 line item can be attributed to defects in the aerial lift.

P.C. Hoag has provided documentation, and thus sufficiently proved, the remaining entries in the chart.  These are the line items dated March 19, 2013, May 21, 2013, December 17, 2013, February 4, 2014, March 11, 2014, August 5, 2015, August 10, 2015, August 24, 2015, September 17, 2015, October 26, 2015, November 4, 2015, November 30, 2015, January 13, 2016, February 1, 2016, all three entries for February 8, 2016, all three entries for June 13, 2016, June 28, 2016, July 18, 2016, August 1, 2016, both entries for October 25, 2016, November 22, 2016, December 5, 2016, and January 25, 2016.  Totaling these entries, the court calculates that P.C. Hoag is entitled to $35,734.61 in damages for repair costs.

### 5.    Total Damages

In sum, the court concludes that P.C. Hoag has proved that it is entitled to recover $58,663.59 in lost profits, $25,816.45 in debt service, and $35,734.61 in repair costs, equaling $120,214.65 in total damages.  P.C. Hoag concedes, however, that this amount must be offset by the amount for which it settled its claims against Man Lift.  P.C. Hoag has represented in its motion for default judgment and supporting affidavit that it settled those claims for $90,000.00.  The court accordingly recommends that the district judge award P.C. Hoag damages in the amount of $30,214.65 for its claims against A-1 and All Terrain.

## C.   <u>Costs</u>

P.C. Hoag seeks to recover the costs it incurred litigating this matter.  P.C. Hoag has not, however, provided the court with any indication as to what those costs might be.  The court therefore recommends that the district judge deny P.C. Hoag's request for costs, without prejudice to P.C. Hoag filing a timely bill of costs as provided by Local Rule 54.1.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, the court recommends that P.C. Hoag's motion for default judgment be denied as to Counts I and IV and granted as to Counts III, IV, V, and VI.  Default judgment should be entered against A-1 and All Terrain on P.C. Hoag's claims for breach of express warranties, breach of implied warranties, breach of contract, and revocation of acceptance.  The court further recommends that P.C. Hoag be awarded damages in the amount of $30,214.65, representing damages for lost profits, debt service, and repair costs, less the amount for which P.C. Hoag settled its claims with Man Lift. Finally, the court recommends that the district judge deny P.C. Hoag's request for costs, without prejudice to P.C. Hoag filing a timely bill of costs as provided by Local Rule 54.1.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  <u>See</u> Fed.

R. Civ. P. 72(b)(2).  The fourteen-day period may be extended
upon motion.  Failure to file specific written objections to the
Report and Recommendation within the specified time waives the
right to appeal the district court's order.  See Santos-Santos
v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016); Fed. R.
Civ. P. 72(b)(2).


                              _____
                              Andrea K. Johnstone
                              United States Magistrate Judge


January 10, 2018

cc:  Paul M. Monzione, Esq.
     Robert J. Meagher, Esq.
     Michael B. O'Shaughnessy, Esq.


                              39